1

2

3

4

5

6

7

8

9

10

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RICHARD A. KATZMAN, | Case No.: 13-CV-00438-LHK |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY; a special district, | JUDGMENT, AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| Defendant. | |

Plaintiff Richard Katzman ("Plaintiff") brings this action under 42 U.S.C. § 1983 against defendant Los Angeles County Metropolitan Transportation Authority ("Defendant"), alleging deprivation of property without due process of law, denial of equal protection of the law, conspiracy to deny him equal protection of the law, and impairment of contracts, in violation of his rights under the Fourteenth Amendment of the U.S. Constitution, Article 1, § 10 of the U.S. Constitution, and Article 1, § 9 of the California Constitution. Before the Court is Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.), ECF. No. 45, and Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 63. Having considered the record in this case, applicable law, and the parties' briefs, the Court DENIES Plaintiff's Motion for Summary Judgment and DENIES IN PART AND GRANTS IN PART Defendant's Motion for Summary Judgment.

## I. BACKGROUND

1

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.    Factual Background

Plaintiff is a resident of Campbell, California, and a retired former employee of the Defendant. Declaration of Richard Katzman in Support of Plaintiff's Motion for Summary Judgment ("Katzman Decl."), ECF No. 48, ¶¶ 1-2.

#### 1.    Plaintiff's Employment History With Defendant.

Defendant first hired Plaintiff in 1986. Katzman Decl. ¶ 3. Defendant subsequently re-hired Plaintiff in 1988. Katzman Decl. ¶ 3. As part of his employment contract with Defendant, Defendant promised to pay Plaintiff a pension. Katzman Decl. ¶ 4. In 1995, Plaintiff left his job with Defendant to take a job with the County of Los Angeles. Katzman Decl. ¶ 6. On June 30, 1995, Plaintiff received a letter from Defendant stating that under the terms of the Los Angeles County Metropolitan Transportation Authority Non-Contract Employees Retirement Income Plan ("Plan"), any employee terminating employment with Defendant after 5 ¾ years of service had a vested interest in the Plan. Exhibit A to the Declaration of Richard Katzman in support of Motion for Summary Judgment ("Katzman Decl. Ex. A"), ECF No. 49-1, at 1. The letter further advised Plaintiff that because he was vested in the Plan, Plaintiff needed to make an irrevocable selection to either have his contributions returned, or leave his contributions in the Plan. *Id*. Plaintiff chose to do the latter. Katzman Decl. ¶ 6.

Plaintiff retired in 2007. Katzman Decl. ¶ 9. Upon retirement, Plaintiff received an application for deferred retirement benefits from Defendant titled, "LACMTA Non-Contract Employees Retirement Income (New) Plan." *Id*. The application informed Plaintiff that he could elect to receive his pension in monthly payments of $639.86, or a lump sum payment of $89,937.44. Exhibit B to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. B"), ECF No. 49-1, at 1. Plaintiff elected to receive monthly payments. *Id*. On May 21, 2007, Plaintiff received a letter from Defendant regarding his "Retirement Estimate." Exhibit C to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. C"), ECF No. 49-1, at 1. The letter informed him that he would receive a monthly pension of $639.86 per month for his lifetime. *Id*. At some point, Plaintiff

United States District Court
For the Northern District of California

1   received a booklet from Defendant that contained general information about Defendant's

2   retirement income plan for non-contract employees. Katzman Decl. ¶ 9.

3          After Plaintiff retired, he received several other sources of income besides the Defendant's

4   pension. Beginning in either 2008 or 2009, Plaintiff worked for a forensics accounting firm until

5   December 2013. Deposition Excerpts of Plaintiff's Deposition in Support of Defendant's

6   Opposition to Plaintiff's Motion for Summary Judgment ("Katzman Dep."), ECF No. 52-2, Tr.

7   12:11-13:1. Plaintiff earned between $5,000 and $20,000 a year from this job, earning $7,000 in

8   2013. Katzman Dep. Tr. 14:1-15:1. Plaintiff also receives a pension from Los Angeles County that

9   started at $729 per month, and is now approximately $780 a month. Katzman Dep. Tr. 15:21-16:3.

10  Plaintiff also receives a pension from the California Public Employees' Retirement System of

11  approximately $3,500 per month. Katzman Dep. Tr. 16:4-:17. Finally, Plaintiff receives

12  approximately $30,000 per year in rental income from a single property. Katzman Dep. Tr. 56:17-

13  :24.

14                    **2.      Defendant's Bi-Annual Audit Policy of Pensioners**

15         Currently, there are approximately 2,500 people who receive a pension from Defendant.

16  Declaration of Janice Olsen in Support of Defendant's Motion for Summary Judgment ("Olsen

17  Decl."), ECF No. 63-2, ¶ 5. Defendant performs a bi-annual audit of its pensioners by mailing each

18  pensioner an audit form letter every two years. *Id.* ¶ 4. The letter is sent via standard mail of the

19  United States Post Office. *Id.* ¶ 6. The pensioners are required to fill out the letter, sign it, have it

20  notarized, and return it to Defendant within 30 days. *Id.*; *see also* Exhibit D to the Declaration of

21  Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. D"), ECF No.

22  49-1, at 1. If a pensioner fails to return the audit letter, Defendant suspends the pensioner's

23  payments. Olsen Decl. ¶ 4. Should the pensioner subsequently fill out, notarize (or otherwise have

24  the pensioner's signature verified), and return the letter, Defendant reinstates the pension and

25  provides any missed payments in one lump sum. *Id.*

26         Defendant conducted its first bi-annual audit in approximately 1983, and it has conducted

27  approximately 15 bi-annual audits to date. Exhibit B to the Declaration of G. Whitney Leigh in

28

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*(left margin)* **United States District Court**  For the Northern District of California

**United States District Court**
For the Northern District of California

Support of Plaintiff's Reply in Support of Motion for Summary Judgment ("Whitley Decl. Ex. B"),
ECF No. 55-2, at 5. In a March 2, 2012 letter provided to Plaintiff, Defendant stated that the Joint
Pension Plan Committee approved the bi-annual audit policy at an April 21, 1983 meeting. Exhibit
3 to Defendant's Motion for Summary Judgment ("Def. Ex. 3"), ECF No. 63-3, Ex. 3, at 1.
Defendant's letter attached the minutes from the Southern California Rapid Transit District Joint
Pension Committee Meeting of April 21, 1983.[1] Exhibit 4 to Defendant's Motion for Summary
Judgment ("Def. Ex. 4"), ECF No. 63-3, at 2. The minutes stated that the "Committee approved the
Audit of the Retirees as presented in a letter dated April 13, 1983." *Id*. at 4. There is no letter from
April 13, 1983 attached, and Defendant stated it does not "have much hope of finding" this letter.
*Id*. at 1.

Among the reasons Defendant conducts a bi-annual audit of its pensioners are: to prevent
fraud by ensuring that the individuals who are receiving the pension payments are in fact the
retirees who are entitled to them, Olsen Decl. ¶ 9; to ensure that Defendant has up-to-date contact
information for its pensioners, *id*. ¶ 10; and to ensure that, if a pensioner dies, joint survivor
benefits are paid, *id*. ¶ 12. In discovery, Defendant claimed the bi-annual audit had uncovered five
instances of fraud. Whitley Decl. Ex. B at 6. In one instance, after Defendant suspended a
pensioner's payments due to failure to return an audit letter, a man not authorized to receive
pension payments contacted Defendant to inquire as to why his relative did not receive her monthly
pension payment. Olsen Decl. ¶ 11. The man stated that the pensioner had died two years before
Defendant suspended pension payments. *Id*. The man also said that prior to calling Defendant, he
had closed the pensioner's account, thereby preventing Defendant from recovering payments. *Id*.

In 2011, Defendant sent bi-annual audit letters to approximately 2,300 pensioners. *Id*. ¶ 16.
As a result of the audit, Defendant suspended 197 pensions. *Id*. Subsequently, "191 of those
suspended pensions were reinstated or the recipient was determined to be deceased." *Id*. In 2013,
Defendant sent bi-annual audit letters to approximately 2,500 pensioners. *Id*. ¶ 15. As a result of

---

[1] Defendant is the successor agency to the Southern California Rapid Transit District. Cal. Pub.
Util. Code § 130050.2.

4

that audit, Defendant suspended 186 pensions. *Id.* Subsequently, "166 of those suspended pensions [were] reinstated or the recipient was determined to be deceased." *Id.*

Plaintiff claimed that none of the documents Defendant sent to Plaintiff informed him of a policy regarding bi-annual audits. *See* Katzman Decl., Exs. A, B, C. The booklet that Plaintiff said he received from Defendant containing general information about Defendant's pension policies similarly did not disclose such a policy. *See* Exhibit H to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. H"), ECF No. 49-1.[2]

Prior to implementing the audit procedure it uses currently, Defendant had a different procedure whereby it would send an initial audit letter to pensioners notifying them of the audit and the due date for a response. *Id.* ¶ 13. If a pensioner did not promptly respond, Defendant would send several reminders over several months that the audit form was due. *Id.* According to Defendant, this practice was a "significant burden" to its staff and resulted in a "significant expense." *Id.* ¶ 13.

### 3. The Bi-Annual Audit As Applied to Plaintiff.

In June 2009, Plaintiff received a form from Defendant titled "2009 Pension Recipient Audit Form." Katzman Decl. Ex. D. The form stated that in an "effort to protect the assets in [the] Pension Plan and to protect all the recipients of pension benefits, we are conducting our bi-annual audit of pension plan recipients." *Id.* The form instructed the recipient to complete the form, sign it, have the signature notarized, and return it before July 31, 2009. *Id.* The form further stated that if it is not convenient for the recipient to have his signature notarized, Defendant can verify the recipient's signature at the office of the Pension and Benefits Department, if the recipient brings the form in person and shows identification. *Id.* The form then stated: "Failure to return a properly completed audit form will result in the suspension of your pension benefits." *Id.* Plaintiff filled out the form and signed it, but did not have it notarized. *Id.*; *see also* Katzman Decl. ¶ 11. Around the

---

[2] Exhibit H consists of two booklets, "Southern California Rapid Transit District Non-Contract Employees Retirement Income Plan – The Old Plan" and "Southern California Rapid Transit District Non-Contract Employees Retirement Income Plan – The New Plan," and a third document titled "Los Angeles County Metropolitan Transportation Authority Non-Contract Employees' Retirement Income Plan Thirteenth Amendment." It is unclear which document Mr. Katzman received from the MTA, but none of the three documents disclose a pension audit policy.

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

time Defendant received Plaintiff's form, Plaintiff had several conversations with Defendant's staff regarding the notarization requirement. Olsen Decl. ¶ 19. Defendant decided to exempt Plaintiff from the notarization requirement for that audit period after a staff member verified Plaintiff's identity over the phone. *Id*.

Approximately two years later, around October 2011, Plaintiff noticed his pension payment had not been electronically-deposited into his bank account as usual. Katzman Decl. ¶¶ 12-13. Plaintiff contacted Defendant, and two of Defendant's staff told Plaintiff that he had failed to return an audit form Defendant mailed that year. *Id*. Plaintiff stated he never received the audit form mailed in 2011, *id*. ¶ 13, although during the course of this litigation Plaintiff obtained a copy of it, *see* Exhibit I to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. I"), ECF No. 49-1. The 2011 audit form is similar to the 2009 audit form, except the 2011 form is preceded by a letter that states, among other things, that the pensioner can also have his or her signature verified by a bank. *Id*. at 1. In November 2011, Plaintiff notified Defendant's staff that he would not complete the 2011 audit form. Olsen Decl. ¶ 18. Plaintiff eventually provided a signed audit form in 2012. *Id*.

In August 2012, Plaintiff's attorney raised several concerns about the audit process with Defendant in an email. Exhibit E to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. E"), ECF No. 49-1. Among the concerns was that Plaintiff traveled frequently and that mail service at his home was "spotty," and therefore a single audit letter provided insufficient notice to Plaintiff that his pension might be suspended. *Id*. at 2. The email suggested that Defendant put additional notice procedures in place before suspending pension payments due to a pensioner's failure to timely return an audit letter. *Id*. Plaintiff also objected that he be forced to pay the notarization fee. *Id*.

In a response to that email, Defendant stated that it sends audit letters in mid-April; therefore, Defendant advised Plaintiff that if he had not received an audit letter by the end of April,

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

he should contact the Defendant's pension benefits department.[3] Exhibit F to the Declaration of Richard Katzman in Support of Motion for Summary Judgment ("Katzman Decl. Ex. F"), ECF No. 49-1, at 2. Defendant further stated that it does not send out audit letters by certified mail because the time and expense of doing so would be "unduly burdensome." *Id*. Defendant also stated that it does not send multiple audit letters because to do so would likewise be "unduly burdensome." *Id*. Defendant also stated that it will not absorb the cost of notarization for all its pension benefit recipients, but that Defendant would accept a certification from Plaintiff's bank verifying Plaintiff's signature in lieu of notarization. *Id*. Defendant contended that most banks provide this service for free. *Id*.

### B.    Procedural History

Plaintiff filed his Complaint, ("Compl."), ECF No. 1, against Defendant and County of Los Angeles on January 31, 2013. Defendant and County of Los Angeles answered on April 1, 2013. ECF No. 5. On April 2, 2013, County of Los Angeles filed a motion to dismiss for lack of jurisdiction and failure to state claim, and a motion to change venue. ECF No. 6. On July 29, 2013, Plaintiff voluntarily dismissed County of Los Angeles from the case, ECF. No. 23, and this Court subsequently denied as moot County of Los Angeles' motion to dismiss and motion to change venue, ECF No. 24.

Plaintiff filed a motion for summary judgment on March 11, 2014 as to his claim that Defendant violated his rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Defendant filed its opposition ("Def.'s Opp'n") on March 25, 2014. ECF No. 52. Plaintiff filed his reply ("Pl. Reply") on April 1, 2014. ECF No. 54. The parties filed various declarations and exhibits in support of their arguments regarding Plaintiff's motion. In support of his motion for summary judgment, Plaintiff filed the Richard Rymer Declaration, ("Rymer Decl."), ECF No. 46; the G. Whitney Leigh Declaration, ECF No. 47; and the Richard Katzman Declaration with nine exhibits, ECF No. 49-1. In support of its opposition Defendant

---

[3] Defendant did not, in fact, send audit letters in mid-April on a regular basis. In 2009, for instance, Defendant mailed the audit letter in June. Olsen Decl. ¶ 7. In 2011, Defendant mailed the audit letter in August. *Id*. In 2013, Defendant mailed the letter in February. *Id*.

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   filed the Janice Olsen Declaration with two exhibits, ECF No. 52-1, and excerpts of Plaintiff's

2   deposition transcript, ECF No. 63-3. In support of his reply, Plaintiff filed the G. Whitney Leigh

3   Declaration, with two exhibits, ECF Nos. 55, 55-1 & 55-2.

4        Defendant subsequently filed a cross-motion for summary judgment on May 21, 2014 as to

5   all four of Plaintiff's claims for relief: (1) violation of the Due Process Clause of the Fourteenth

6   Amendment; (2) violation of the Equal Protection Clause of the Fourteenth Amendment; (3)

7   conspiracy to violate Plaintiff's Equal Protection rights; and (4) violation of Article 1, § 10 of the

8   U.S. Constitution, and Article 1, § 9 of the California Constitution. Plaintiff filed his opposition

9   ("Pl. Opp'n") on June 25, 2014. ECF No. 66. Defendant filed his reply ("Def. Reply") on July 9,

10  2014. ECF No. 69. Again, the parties filed declarations and exhibits in support of their arguments

11  regarding Defendant's motion. In support of its motion for summary judgment, Defendant filed the

12  Abraham Escareno Declaration, ECF No. 63-1; the Janice Olsen Declaration, ECF No. 63-2; and

13  seven exhibits, ECF No. 63-3. In support of his opposition, Plaintiff filed the G. Whitney Leigh

14  Declaration, ECF No. 67, with five exhibits, ECF Nos. 67-1, 67-2, 67-3, 67-4, & 67-5. Plaintiff

15  also filed the Richard Katzman Declaration, ECF No. 68, with seven exhibits, ECF Nos. 68-1, 68-

16  2, 68-3, 68-4, 68-5, 68-6, & 68-7.

## II.   LEGAL STANDARD

18       Summary judgment is appropriate if, viewing the evidence and drawing all reasonable

19  inferences in the light most favorable to the nonmoving party, there are no genuine issues of

20  material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a);

21  *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986). Where, as here, parties submit cross-motions

22  for summary judgment, each motion must be considered on its own merits, and the court must

23  consider the evidence submitted with both motions before ruling. *Fair Hous. Council of Riverside*

24  *County, Inc. v. Riverside Two,* 249 F.3d 1132, 1135-36 (9th Cir. 2001). At the summary judgment

25  stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether

26  there is a genuine factual issue for trial." *House v. Bell,* 547 U.S. 518, 559-60 (2006). A fact is

27  "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (internal citations omitted).

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.,* 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party, but on an issue for which the opposing party will have the burden of proof at trial, the party moving for summary judgment need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *accord Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250.

## III.    DISCUSSION

A plaintiff asserting a claim under § 1983 must demonstrate that (1) the action occurred "under color of state law," and (2) the action resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir. 1988) (internal citations omitted). The parties do not dispute that Defendant, a state chartered regional transportation planning and operating agency, acted under color of state law. They dispute only whether Defendant in fact violated any of Plaintiff's U.S. or state constitutional rights.

### A.    Plaintiff's  Motion for Summary Judgment as to Plaintiff's Due Process Claim

Plaintiff moved for summary judgment as to his Due Process claim, *see* Pl. Mot., on the ground that Defendant suspended his pension with insufficient notice, and therefore deprived Plaintiff of his property in violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, Compl. ¶¶ 20-26. Defendant denied Plaintiff's motion on two grounds. First, Defendant claimed that Plaintiff does not have a property interest in his pension and therefore has

9

1  no protection from the Due Process Clause. Second, even if Plaintiff did have a property interest in

2  his pension, Defendant argued its mailing of the bi-annual audit letter provided Plaintiff with

3  constitutionally adequate process. Def. Opp'n, ECF No. 52, at 5-14. Plaintiff bears the burden of

4  proof at trial on his § 1983 claims. Therefore, Plaintiff must affirmatively demonstrate that no

5  reasonable trier of fact could find other than that he had a property interest in his pension, and that

6  the Defendant did not provide adequate process in connection with the suspension of his pension

7  payments. As discussed more fully below, the Court finds that Plaintiff does have a property

8  interest in his pension. However, construing all evidence in favor of Defendant, a triable issue

9  exists as to whether Defendant's bi-annual audit policy provided Plaintiff with constitutionally

10 sufficient process. Therefore, as detailed further below, the Court DENIES Plaintiff's motion for

11 summary judgment.

### 1. Whether Plaintiff has a Constitutionally Protected Property Interest in his Pension

An individual has a property interest in a government benefit only if he or she has a

legitimate claim of entitlement to it. *Knudson v. City of Ellensburg*, 832 F.2d 1142, 1144 (9th Cir.

1987) (citing *Board of Regenets v. Roth*, 408 U.S. 564, 577 (1972)). A mere abstract need or desire

is not enough. *Id.* The underlying substantive interest can be created by "'existing rules or

understandings that stem from an independent source such as state law,'" *id.*, (quoting *Roth*, 408

U.S. at 577), or from written contracts that serve as "clear evidence of a formal understanding

supporting a claim of entitlement," *San Bernardino Physicians' Servs. Med. Group, Inc. v. County

of San Bernardino*, 825 F.2d 1404, 1408 (9th Cir. 1987). However, federal constitutional law

determines whether that interest constitutes "property" protected by the Fourteenth Amendment,

*Knudson*, 832 F.2d 1144-45.

Not every state entitlement rises to the level of a constitutionally protected property interest.

*See, e.g.*, *San Bernardino Physicians' Servs.*, 825 F.2d at 1408-09 (supplier of medical services to

county did not have a constitutionally protected entitlement in its services contract.) However,

under Ninth Circuit precedent, "the deprivation of *pension* or *disability* benefits amounts to the

deprivation of constitutionally protected property." *Portman v. County of Santa Clara*, 995 F.2d

10

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

898, 905-07 (9th Cir. 1993) (emphasis in original); *see also Kaplan v. Cal. Pub. Employees' Retirement Sys.*, No. C98-1246 CRB, 1998 WL 575095, at *9 (N.D. Cal. Sept. 3, 1998) ("The Ninth Circuit has held that the complete deprivation of pension or disability benefits amounts to the deprivation of constitutionally protected property.") (Breyer, J.).

Defendant argued that Plaintiff does not have a constitutionally protected property interest in his pension because he does not have a "legitimate claim of entitlement" to it. Instead, Defendant claimed that Plaintiff's only interest is the right for payment under contract. Def. Opp'n, at 7, 9. In support, Defendant cited *Lujan v. G & G Fire Sprinklers, Inc.*, in which a state agency pursuant to state law withheld payment from a subcontractor on public works projects, due to the subcontractor's violations of the California Labor Code. 532 U.S. 189, 191-93 (2001). The Supreme Court held that G & G had no present entitlement to the money G & G claimed was owed; all G & G had was a claim that it complied with the Labor Code and was therefore owed payment in full, a claim that could "be fully protected by an ordinary breach-of-contract suit." *Id.* at 196. Defendant also cited *DeBoer v. Pennington*, 287 F.3d 748 (9th Cir. 2002) (*Pennington II*), which involved the termination of a services contract between a city and the operating company of a city-owned cemetery. *DeBoer v. Pennington*, 206 F.3d 857, 860-62 (2000), *vacated by City of Bellingham v. DeBoer*, 532 U.S. 992 (2001). In *Pennington II*, the Ninth Circuit held that a common law breach of contract claim provided adequate process for the plaintiff's alleged deprivation of property, because the deprivation did not constitute a denial of a "present entitlement." *Pennington II*, 287 F.3d at 749-50. "Present entitlement" was defined as "a right by virtue of which [one is] presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." *Id.* (*quoting Lujan*, 532 U.S. at 196).

Neither *Lujan* or *DeBoer* is applicable here. Both cases involved plaintiffs who lacked a "present entitlement" to the claimed property. Here, Defendant conceded that "Plaintiff's retirement in 2007 triggered an obligation to pay a public pension." Def. Opp'n at 1. Furthermore, in its responses to Plaintiff's first request for admission ("Admit that Katzman's pension vested prior to August 2011"), Defendant responded, "Admit." Exhibit A to the Declaration of G.

11

United States District Court
For the Northern District of California

Whitney Leigh in Support of Plaintiff's Reply in Support of Motion for Summary Judgment

("Whitley Decl. Ex. A"), ECF No. 55-2, at 2. Indeed, Defendant sent Plaintiff a letter dated June

30, 1995 confirming that Plaintiff was vested in the pension plan and that, upon his retirement and

successful application for benefits, he would be entitled to receive payments under the plan.

Katzman Decl., Ex. A, at 1. Once his pension vested, Plaintiff had a present entitlement to it. *See*

*Knudson*, 832 F.2d at 1147 (equating a regular pension with a disability benefit, and noting that

once a disability benefit vested, the recipient "is entitled under [state] law to receive the benefit").[4]

The Court finds that Plaintiff has a present entitlement to his pension, the deprivation of

which amounts to a deprivation of constitutionally protected property.

### 2.   Whether Defendant Provided Plaintiff Constitutionally Deficient Process Before Suspending His Pension

Whether Plaintiff has a constitutionally protected property interest does not end the inquiry.

Next, the Court must employ a balancing test to determine what process is due. Due process is a

flexible concept and its procedural requirements vary depending upon the particular deprivation.

*Orloff v. Cleland*, 708 F.2d 372, 378 (9th Cir. 1983) (citing *Morrissey v. Brewer,* 408 U.S. 471,

481 (1972)). The determination of what procedures satisfy due process depends upon an analysis of

the particular case in accordance with the three-part balancing test outlined in *Mathews v. Eldridge,*

---

[4] Similarly, two of the other cases Defendant cited are inapplicable because they did not involve claims to present entitlements. *See Vuksanovich-Dunn v. Miami Unified Sch. Dist. No. 40*, 550 Fed. Appx. 528, 529 (9th Cir. 2013) (no present entitlement where there is not a "clear and mutual understanding that the entitlement exists" because the parties dispute the meaning of a word in the contract that created the alleged entitlement); *Andree v. Hoy*, No. 11-cv-02020, 2012 WL 5989466, at *8 (D. Colo. 2012) (plaintiff failed to show that the agreement at issue "involved any 'present entitlements'"). Defendant also cited numerous other cases, practically all of which are outside the Ninth Circuit, and all of which address what *process was due* to plaintiffs, not whether the plaintiff had a constitutionally protected property interest. *See Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1272-74 (6th Cir. 1988) (noting that plaintiff "could have a constitutionally protected property interest" in accumulated sick days but finding process was constitutional); *Hill v. City of Scottsdale*, No. CV11-1324-PHX-JAT, at *4-7 (D. Ariz. July 19, 2012) (assuming that plaintiffs "have a constitutionally protected property interest" in accumulated medical leave, but finding process to be adequate); *Russo v. Sch. Bd. of City of Hampton*, 835 F. Supp. 2d 125, 135-36 (E.D. Va. 2011) (not reaching the issue of whether plaintiff had a property interest in salary and benefits, but even if he did, provided process was adequate); *Ramirez-De Leon v. Mujica-Cotto*, 345 F. Supp. 2d 174, 191 (D.P.R. 2004) ("[e]ven assuming [plaintiff] has a property interest in his accrued vacation and sick leave" it was not a significant enough interest to warrant greater procedural protections than those already in place). The Court will address the adequacy of Defendant's process in Part III.A.2, *infra*.

12

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

424 U.S. 319 (1976). The factors that must be considered are: (1) the private interest that will be affected; (2) the risk of an erroneous deprivation of that interest through the procedure used; and (3) the government's interest, including the fiscal and administrative burdens that any additional procedural requirements would entail. *Id.* at 335.

In applying the *Mathews* factors, it is clear that Plaintiff has not carried his burden of identifying the absence of a genuine issue of any material facts. *Celotex Corp.*, 477 U.S. at 323. Under the first factor of the *Mathews v. Eldridge* test, the Court weighs the private interest Plaintiff has in the uninterrupted receipt of his pension. Relevant to this inquiry is the degree of "hardship imposed upon the [recipient] of the erroneously terminated" governmental benefit once the benefit ends. *Mathews*, 424 U.S. at 342. For instance, an individual "at the very margin of subsistence" or who relies on his benefits for "the very means by which to live" has a relatively strong private interest in the uninterrupted receipt of his benefit. *Id.* at 339 (internal quotation marks omitted). In contrast, one whose benefits "are not based upon financial need" is likely to have a weaker private interest. *Id.* at 340; *see also id.* at 343 (degree of private interest diminished where individual has "other potential sources of . . . income"); *Parente v. Town of W. Warwick*, 685 F. Supp. 873, 876 (D.R.I. 1988) (applying *Mathews* test and finding that the plaintiff has a "substantial" private interest in his pension benefits when they "constitute a large portion of plaintiff's post-retirement income"). Also relevant in assessing the impact of official action on the private interest is "the possible length of wrongful deprivation of . . . benefits," or the time between when the benefits are terminated and when the individual may have a hearing on the benefits' restoration. *Mathews*, 424 U.S. at 341-42 (citing *Fusari v. Steinberg*, 419 U.S. 379, 389 (1975)).

Here, Plaintiff argued that he has a "compelling interest" in his pension, but cited no facts or federal law to this effect. *See* Pl. Mot. at 9. Plaintiff also stated that he "depends on his pension benefits from the MTA as one his few sources of post-retirement income," but cited to no part of the record in support of this. *Id.* at 5. Indeed, the record demonstrates that while it is technically true that Plaintiff has few other *sources* of post-retirement income, Defendant's pension payments constituted approximately 8 percent of Plaintiff's total income in 2013. Katzman Depo. Tr. 14:1-

13

15:1; 15:21-16:17; 57:17-:24. In addition, the record demonstrated that when Defendant suspends a pensioner's payments because of failure to respond to an audit letter, Defendant restores those payments when it receives a completed and notarized letter. Olson Decl. ¶ 4. In sum, Plaintiff has not carried his burden to show the absence of a genuine issue with regards to the degree of his private interest in the uninterrupted payment of his pension.

The second factor of the *Mathews v. Eldridge* test is the risk that the MTA's existing audit procedure will erroneously deprive a pensioner of his pension. Here, the Court focuses on "the generality of cases to which [the challenged process] applies." *Walters v. Nat'l Assn of Radiation Survivors*, 473 U.S. 305, 330 (1985); *Mathews*, 424 U.S. at 344 ("procedural due process rules are shaped by the risk of error inherent in the truthfinding process *as applied to the generality of cases*, not the rare exceptions.") (emphasis added). Therefore, "process which is sufficient for the large majority of a group of claims is by constitutional definition sufficient for all of them." *Walters*, 473 U.S. at 330. It follows that one way to gauge the risk of error in existing procedures is to look at the percentage of individuals who are subject to erroneous deprivation. *See Veterans for Common Sense v. Shineki*, 678 F.3d 1013, 1035-36 (9th Cir. 2012) (risk of erroneous deprivation of veteran's benefits was not high when approximately four percent of the total number of recipients were affected), *cert denied*, 133 S. Ct. 840 (U.S. 2013); *see also Graves v. Meystrik*, 425 F. Supp. 40, 49 (E.D. Mo. 1977) (error rate of 18.96 percent meant risk of erroneous deprivation of unemployment benefits was "slight"); *Dupuy v. Samuels*, 397 F.3d 493, 509 (7th Cir. 2005) (affirming district court order finding that 74.6 percent error rate was constitutionally deficient under *Mathews* test).

In the instant case, Defendant claimed to have conducted approximately 15 bi-annual audits, Leigh Decl., Ex. B, at 5, but Defendant provided approximate statistics for only two of its most recent audits, in 2011 and in 2013, Olsen Decl. ¶¶ 15-16. In 2011, Defendant sent approximately 2,300 bi-annual letters, and as a result of the audit suspended 197 pensions. Olsen Decl. ¶ 16. Defendant subsequently reinstated 191 of those suspended pensions, or determined that the recipient was deceased (although the MTA does not specify how many pensions were

14

reinstated and how many recipients were determined to be deceased.) *Id*. In 2013, Defendant sent approximately 2,500 bi-annual audit letters, and suspended 186 pensions as a result. Olsen Decl. ¶ 15. Defendant subsequently reinstated 166 of those suspended pensions, or determined that the recipient was deceased (although, again, the separate numbers are not provided.) *Id*.

Viewing the evidence in the light most favorable to Defendant, the Court finds that there is a genuine issue as to the risk that Defendant's existing procedures will erroneously deprive pensioners of their pensions. In his motion for summary judgment, Plaintiff cited Defendant's bi-annual audit statistics from 2011 and 2013 to argue that the bi-annual audit had an error rate of over 90 percent. *See* Pl. Reply at 4-5. To arrive at this figure, Plaintiff took the number of pensions that the Defendant reinstated after its audit for each year, and divided by the total number of pensions suspended in that year. *Id*. Plaintiff's statistical argument is unpersuasive. First, the statistics provided by the Defendant are imprecise. Presumably, if Defendant suspended a pension as a result of its bi-annual audit, and subsequently reinstated that pension, Defendant suspended that pension in error. However, Defendant combined the number of "suspended pensions … reinstated" with the number of instances where "the recipient was determined to be deceased." Olsen Decl. ¶¶ 15-16. Therefore, because the numbers were combined, it is difficult to determine the error rate, even for the years that Defendant provided statistics. Second, the universe of statistics Defendant provided is limited. Defendant provided approximate audit statistics for only two of Defendant's 15 bi-annual audits. This is too small a sample to conclude that Defendant's bi-annual audit process has an unreasonably high risk of error. Finally, Plaintiff applied the wrong denominator in its statistical argument. To determine the error rate of Defendant's bi-annual audit procedure, one should divide the number of erroneously-suspended pensions by the *total number of pensions audited*, not use (as Plaintiff does) the number of pensions suspended that year. For instance, in 2011 Defendant audited approximately 2,300 pensions, and in 191 of those cases either reinstated the pension after suspension or determined the pensioner was deceased. Olsen Decl. ¶ 16. Assuming all 191 of those suspensions were erroneous, then Defendant's rate of error in 2011

United States District Court
For the Northern District of California

1   was approximately 8 percent. This is significantly lower than Plaintiff's claimed error rate.[5]

2          The third and final factor in the *Mathews* test is the fiscal and administrative burdens that

3   any additional procedural requirements would entail. Relevant to this inquiry is the degree of

4   Defendant's interest in "preventing . . . fraud and in avoiding erroneously providing benefits."

5   *Ching v. Mayorkas*, 725 F.3d 1149, 1158 (9th Cir. 2013). Also relevant is the cost of making

6   changes to Defendant's process, although "'[f]inancial cost alone is not a controlling weight in

7   determining whether due process requires a particular procedural safeguard.'" *Id.* at 1159 (quoting

8   *Mathews*, 424 U.S. at 348). Although Plaintiff does not address it, Defendant has a substantial

9   interest in preventing fraud as to its pension system; indeed, Defendant uncovered five instances of

10  fraud through its audit procedure. Whitley Decl. Ex. B at 6.  Plaintiff similarly does not directly

11  address the fiscal and administrative burdens that any changes to Defendant's audit procedure

12  would entail, though Plaintiff does suggest several possible modifications. Among Plaintiff's

13  proposed changes are: (1) sending a letter alerting beneficiaries in advance of the bi-annual audit,

14  Pl. Mot. at 13; (2) instituting a second mailing, *id.*; (3) using certified mail, *id.*; (4) establishing a

15  consistent schedule for when Defendant will issue audit letters, *id.* at 13-14; (5) taking steps to

16  ascertain why a pensioner did not return a letter, *id.* at 14.; and (6) notifying a pensioner that his or

17  her pension has in fact been terminated, *id.* Defendant disputed the efficacy and practicality of

18  some of these proposals. Defendant did not identify what fiscal or administrative burdens would be

19  entailed by using certified mail, and instead argued that Plaintiff cited no authority requiring use of

20  certified mail. Def. Opp'n at 13. However, in an email submitted as an exhibit to Plaintiff's

21  declaration, Defendant stated that to use certified mail would be "unduly burdensome." Katzman

22  Decl., Ex. F, at 2. Defendant also stated that the MTA does not send multiple audit letters because

23

24  [5] Plaintiff raised additional arguments as to why Defendant's audit procedure has a high risk of
    error. For instance, Plaintiff argued that a single audit letter can be erroneously sent or delivered,
25  that the audit letter's 30-day response time is too short, and that the Defendant does not do
    anything to determine why a pensioner failed to return an audit letter. Pl. Mot. at 10-11. In
26  weighing the *Mathews* factors, the Court "may not speculate about 'hypothetical' or 'imaginary'
    cases." *Faulkner v. Gusman*, CIV.A 13-6813, 2014 WL 1876213, at *5 (E.D. La. May 9, 2014)
27  (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). Plaintiff
    has offered hypothetical reasons why Defendant's audit procedures *might* entail risk, but the
28  hypothetical reasons do not satisfy Plaintiff's burden to show that no triable issue exists.

16

United States District Court
For the Northern District of California

1    it would likewise be "unduly burdensome." Katzman Decl., Ex. F, at 2. In addition, Defendant

2    claimed that it has used multiple notices in the past to little effect because a significant proportion

3    of pensioners would wait until the last reminder to provide Defendant with the audit form. Olsen

4    Decl. ¶ 13. Defendant further stated, without providing any details, that sending multiple audit

5    notices imposed a "significant burden … and expense." *Id.* Defendant did not address what fiscal

6    or administrative burdens would be entailed by establishing a consistent schedule for mailing bi-

7    annual audit notices, determining why a pensioner did not respond, or notifying pensioners when

8    their pensions were suspended. *See* Def. Opp'n at 13. Instead, Defendant argued that Plaintiff cited

9    no authority for why these measures should be required, and that these measures would not have

10   made a difference in Plaintiff's case. *Id.* Nevertheless, viewing the evidence in the light most

11   favorable to Defendant, the Court finds that there is a triable issue as to the burden that any

12   changes would impose on Defendant.

13        Plaintiff failed to show that there is no genuine issue of material fact as to whether

14   Defendant's policy of mailing bi-annual audit letters provided constitutionally deficient process.

15   Accordingly, the Court DENIES Plaintiff's motion for summary judgment.

16        **B.    Defendant's Motion for Summary Judgment as to Plaintiff's Due Process
          Claim**

17

18        Defendant has moved for summary judgment as to Plaintiff's Due Process claim. Def. Mot.

19   at 6-13. Defendant's motion on this claim is virtually identical—in its language and cited

20   authorities—to the opposition Defendant filed to Plaintiff's motion for summary judgment. *See*

21   Def. Opp'n. Defendant makes essentially two arguments: first, that Plaintiff did not have a

22   constitutionally protected property interest in his pension; second, that Defendant provided Plaintiff

23   with adequate process. Def. Mot. at 6-13. Plaintiff bears the burden of proof at trial on his § 1983

24   claims. Therefore, as the moving party who will not have the burden of proof at trial, Defendant

25   need only point out that there is an absence of evidence in Plaintiff's case. *Celotex*, 477 U.S. at

26   323. As discussed more fully below, the Court finds that Plaintiff does have a property interest in

27   his pension. However, construing all evidence in favor of Plaintiff, the non-moving party, the Court

28

17

also finds that a triable issue exists as to whether Defendant's bi-annual audit policy provided Plaintiff with constitutionally deficient process. Therefore, the Court DENIES Defendant's motion for summary judgment as to Plaintiff's Due Process claim.

### 1.   Plaintiff's Property Interest in his Pension Payments

As discussed, in Part III.A.1, *supra*, the Court finds that Plaintiff has a constitutionally protected interest in his pension. Under Ninth Circuit precedent, "the deprivation of *pension* or *disability* benefits amounts to the deprivation of constitutionally protected property." *Portman*, 995 F.2d at 905-07 (emphasis in original). Here, there is no dispute that Plaintiff's pension had vested prior to the events at issue; indeed, Defendant conceded that Katzman's "retirement in 2007 triggered an obligation to pay a public pension." Def. Mot. at 2; *see also* Katzman Decl., Ex. A at 1 (letter from Defendant confirming that Plaintiff was vested in Defendant's pension plan). Once his pension vested, Plaintiff "is entitled . . . to receive the benefit" and therefore has a present entitlement to it. *Knudson*, 832 F.2d at 1147.

### 2.   Whether Defendant provided Plaintiff Constitutionally deficient process before suspending his pension

The substantive standard that determines what process is due is the same *Mathews v. Eldridge* test discussed in Part II.A.2, *supra*. The standard of proof, however, is different. Here, because Defendant does not have the burden of proof at trial, Defendant need only point out that there is an absence of evidence to support Plaintiff's case. However, Defendant fails to carry its burden.

For purposes of Defendant's motion, the Court assumes, without deciding, that Plaintiff did not have a significant private interest in his pension under the first prong of the *Mathews* test. Even accepting this as true, Defendant has failed to show an absence of evidence to support Plaintiff's claim with respect to the second and third factors of the *Mathews* test (respectively, the risk of an erroneous deprivation of the property interest through the procedure used, and the fiscal and administrative burdens that any additional procedural requirements would entail.) Defendant advanced two arguments as to why its existing bi-annual audit procedures do not have a substantial risk of an erroneous deprivation of a pension. First, Defendant argued that notice by mail satisfies

18

**United States District Court**
For the Northern District of California

1  due process requirements. *See, e.g.*, *Jones v. Flowers*, 547 U.S. 220, 226, 235-38 (notice is

2  constitutionally sufficient "if it was reasonably calculated to reach the intended recipient when

3  sent," but holding in this particular case that notice by certified mail was insufficient). While it is

4  true that in some instances notice by mail is constitutionally sufficient, it does not follow that such

5  notice will be constitutionally sufficient in all instances. *See Morrissey*, 408 U.S. at 481 ("[D]ue

6  process is flexible and calls for such procedural protections as the particular situation demands.")

7  Second, Defendant pointed to its bi-annual audit statistics from 2011 and 2013 to argue that its

8  error rate is low. Def. Mot. at 12-13; Def. Reply at 3. The Court discussed in detail the deficiencies

9  of Defendant's statistics in Part II.A.2, *supra*. In sum, the somewhat unclear statistics from only

10  two of 15 bi-annual audits do not show an absence of evidence to support Plaintiff's case. As for

11  the fiscal and administrative burdens that additional procedural requirements would entail,

12  Defendant did not address this point in its moving papers or its reply. *See* Def. Mot. at 6-13; Def.

13  Reply at 3-4. The record reflects that Defendant told Plaintiff that it would be unduly burdensome

14  for Defendant to send its bi-annual audit letters via certified mail, Katzman Decl. Ex. F at 2, or to

15  send multiple audit notices to pensioners, *id.*, although Defendant does not detail why this would

16  be the case. At the very least, there is a genuine issue of material fact as to what burden would be

17  imposed on Defendant by adopting additional procedural safeguards.

18      Defendant failed to show that there is an absence of evidence supporting Plaintiff's case.

19  Accordingly, the Court DENIES Defendant's motion for summary judgment with respect to

20  Plaintiff's Due Process claim.

21      **C.      Defendant's Motion for Summary Judgment as to Plaintiff's Equal Protection**
22  **Claim**

23      In his complaint, Plaintiff alleges that when he transferred employment from Defendant to

24  County of Los Angeles, Defendant excluded Plaintiff from a pension increase granted to all other

25  of Defendant's similarly situated employees. Compl. ¶ 19. Plaintiff therefore brought a claim under

26  § 1983 alleging that Defendant violated his rights under the Equal Protection Clause of the U.S.

27  Constitution. Compl. ¶¶ 28-30. Defendant moved for summary judgment as to this claim, arguing

28  that there is no legal basis for Plaintiff to assert an Equal Protection violation. Def. Mot. at 13.

19

1    Plaintiff's opposition fails to respond.

2           When a public employee asserts that he or she was arbitrarily treated differently from other

3    similarly situated employees, with no assertion that the different treatment was based on the

4    employee's membership in any particular class (a so-called "class-of-one" theory of equal

5    protection), that claim cannot be brought under the Equal Protection Clause of the U.S.

6    Constitution. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594 (2008). *Engquist* involved a public

7    employee who brought an Equal Protection claim for being fired for "arbitrary, vindictive, and

8    malicious reasons." *Id*. at 595 (internal quotation marks omitted). The Court, balancing the

9    constitutional rights of public employees with the discretion of the government to act as an

10   employer, held that this claim had no legal basis. The Court reasoned that to hold otherwise would

11   open the government up to a constitutional claim every time the government treated one of its

12   employees differently for any reason. *Id*. at 607-08. In that sense, "the class-of-one theory of equal

13   protection—which presupposes that like individuals should be treated alike, and that to treat them

14   differently is to classify them in a way that must survive at least rationality review—is simply a

15   poor fit in the public employment context." *Id*. at 605; *Okwu v. McKim*, 682 F.3d 841, 846 (9th Cir.

16   2012) ("class of one" theory is not available in the public employment context).

17          Plaintiff made no attempt to identify any evidence in the record that would suggest a

18   genuine issue of material fact as to Plaintiff's Equal Protection claim. Indeed, Plaintiff's opposition

19   fails to respond to Defendant's motion as to this claim. *See* Pl. Opp'n. Moreover, the Court has not

20   found any evidence in the record to support Plaintiff's Equal Protection claim. Because there is an

21   absence of any evidence to support Plaintiff's claim, and because a "class of one" claim is barred in

22   the public employment context, the Court GRANTS Defendant's motion for summary judgment as

23   to Plaintiff's Equal Protection claim.

24          **D.      Defendant's Motion for Summary Judgment as to Plaintiff's Conspiracy to
                      Violate the Equal Protection Clause**

25

26          Plaintiff claimed that when he left the employment of Defendant to take a job with the

27   County of Los Angeles, Defendant colluded with the County of Los Angeles to deny Plaintiff a

28   pension increase that was granted to other similarly-situated employees. Compl. ¶ 19. Accordingly,

20

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1
2
3
4
5

Plaintiff asserts a conspiracy claim under § 1983 to violate Plaintiff's Equal Protection rights. *Id.* ¶¶ 32-34. Defendant moved for summary judgment as to Plaintiff's conspiracy claim, arguing that because Plaintiff's underlying Equal Protection claim lacked merit, the conspiracy claim was necessarily deficient. Def. Mot. at 14. Plaintiff's opposition fails to address Defendant's motion as to the conspiracy claim.

6
7
8
9
10
11
12
13
14
15
16
17
18

Conspiracy is not itself a constitutional tort under § 1983. *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (citing *Cassettari v. Nev. County*, 824 F.2d 735, 739 (9th Cir.1987)). "Conspiracy may, however, enlarge the pool of responsible defendants by demonstrating their causal connections to the [§ 1983] violation; the fact of the conspiracy may make a party liable for the unconstitutional actions of the party with whom he has conspired." *Id.* However, because conspiracy is not itself a tort under § 1983, a claimed conspiracy to violate § 1983 must always have an underlying constitutional violation. *Id.* Therefore, if a plaintiff's underlying § 1983 violation is deficient, any alleged conspiracy based on that defective § 1983 claim is precluded. *Cassettari v. County of Nevada*, 824 F.2d 735, 739 (9th Cir. 1987); *Dooley v. Reiss*, 736 F.2d 1392, 1395 (9th Cir. 1984) ("The absence of an actual deprivation implies that plaintiffs also failed to state a section 1983 claim based on the alleged conspiracy . . . ."); *Lim v. City & County of San Francisco*, 467 F. App'x 588, 589 (9th Cir. 2012) (affirming district court dismissal of conspiracy claim because plaintiff's underlying allegation of a § 1983 claim was insufficient).

19
20
21
22
23
24
25

Here, Plaintiff's "class-of-one" Equal Protection claim is insufficient to state a claim for deprivation of Plaintiff's Equal Protection rights under § 1983. *See* Part III.C, *supra*. Therefore, Plaintiff's conspiracy claim is legally precluded. Moreover, just as there is an absence of evidence to support Plaintiff's Equal Protection claim, there is an absence of evidence to support Plaintiff's conspiracy claim. In addition, Plaintiff does not point to any genuine issues of material fact that would support his conspiracy claim. Therefore, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's conspiracy claim.

26
27

### E.   Defendant's Motion for Summary Judgment as to Plaintiff's Impairment Clause Claim

28

Plaintiff claimed that Defendant enacted its bi-annual audit procedure after Plaintiff's

21

1   pension had vested, and that Defendant modified Plaintiff's pension contract. *See* Compl. ¶¶ 35-40.

2   Therefore, Plaintiff argued Defendant violated U.S. and California Constitutional provisions

3   barring the impairment of contracts. *Id*. Defendant moved for summary judgment as to this claim,

4   arguing that there was no change in law because Defendant's bi-annual audit procedures were

5   already in place at the time Plaintiff's pension vested. Def. Mot. at 14-16. Defendant also argued

6   that the Impairments Clause of both the U.S. and California Constitutions bar legislative actions

7   that impair contracts, and that the actions of Defendant are not legislative. *Id*. Finally, even if

8   Defendant's actions were legislative, and Defendant did enact its bi-annual audit policy after

9   Plaintiff's pension rights vested, Defendant argued its bi-annual audit policy does not substantially

10   impair Plaintiff's contractual rights. *Id*. Plaintiff opposed Defendant's motion as to the Impairments

11   Clause claim. Plaintiff argued that Defendant has delegated legislative authority to enact

12   procedures governing its pensions, and therefore its act constituted legislative action. Pl. Opp'n at

13   21. Plaintiff also argued that Defendant failed to establish that its bi-annual audit policy was in

14   place at the time Plaintiff's pension vested,[6] *id*. at 22, and that the bi-annual audit policy

15   substantially impaired his rights. *Id*. For the purposes of deciding this motion, the Court assumes

16   without deciding that the Defendant's actions constituted legislative action and that Defendant

17   enacted its bi-annual audit policy after Plaintiff's pension rights vested. Even if these preconditions

18   are true, as discussed more fully below, the undisputed facts show that the bi-annual audit policy

19   did not substantially impair any contractual relationship between Plaintiff and Defendant.

20   Therefore, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's

21   Contracts Clause claim.

22        The Contracts Clause of the U.S. Constitution states in relevant part: "No State shall . . .

---

[6] As stated above, Defendant claimed that its bi-annual audit policy has been in place since 1983.
*See* Def. Mot. at 15. In a letter Defendant sent to Plaintiff on March 2, 2012, Defendant stated that
the Joint Pension Plan Committee "approved the procedure of conducting a bi-annual audit of
retirees at its meeting on April 21, 1983." Def. Mot. Ex. 3 at 1. Defendant's March 2, 2012 letter
attached minutes from that pension plan committee meeting. The minutes state that the "Committee
approved the Audit of the Retirees as presented in a letter dated April 13, 1983." Def. Ex. 4 at 4.
Defendant has not provided Plaintiff or the Court a copy of the April 13, 1983 letter. Moreover,
Defendant stated it has not seen a copy of the letter, and does not "have much hope of finding it."
*Id*. at 1. Therefore, Plaintiff argued it is not clear whether the audit policy approved on April 21,
1983 is in fact Defendant's bi-annual audit policy as it exists today. *See* Pl. Opp'n at 22.

22

United States District Court
For the Northern District of California

pass any . . . Law impairing the Obligation of Contracts."[7] United States Const. art. I, § 10, cl. 1.

Although the text of the Contracts Clause is "facially absolute," the U.S. Supreme Court has long

held that "its prohibition must be accommodated to the inherent police power of the State 'to

safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kan. Power & Light

Co.,* 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434

(1934)). To determine whether legislation violates the Contracts Clause, the court must consider

several factors. First, whether the state law has, in fact, operated as a substantial impairment of a

contractual relationship; second whether the state has a significant and legitimate public purpose

behind the regulation; and third, if such a legitimate purpose is established, whether the adjustment

of the rights and responsibilities of the contracting parties is based upon reasonable conditions and

are of a character appropriate to the public purposes justifying the legislation's adoption. *Id*. at

411–12. "The same analysis applies under the [California] constitution's contracts clause."

*Mussetter Distrib., Inc. v. DBI Beverage Inc.*, 685 F. Supp. 2d 1028, 1031-32 (N.D. Cal. 2010)

(*citing Barrett v. Dawson*, 71 Cal. Rptr. 2d 899, 903-04 (1998); *Calfarm Ins. v.  Deukmejian*, 771

P.2d 1247, 1259-62 (Cal. 1989)).

    The threshold inquiry is whether the state law has caused a substantial impairment of a

contractual relationship. *Energy Reserves Group,* 459 U.S. at 411. Total destruction of contractual

rights is not necessary for a finding of substantial impairment. *United States Trust Co. v. New

Jersey*, 431 U.S. 1, 17 (1977). Yet, the impairment must be "substantial" or the constitutional

inquiry ends. *Allied Structural Steel v. Spannaus*, 438 U.S. 234, 245 (1978). To rise to the level of

substantial impairment, the impairment must "deprive[] a private party of an important right,

thwart[] performance of an essential term, defeat[] the expectations of the parties, or alter[] a

financial term." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003). "'Minimal

alteration of contractual obligations may end the inquiry at its first stage.'" *Nw. Nat'l. Life Ins. Co.

v. Tahoe Reg'l Planning Agency*, 632 F.2d 104, 106 (9th Cir. 1980) (quoting *Allied Structural

---

[7] The California Constitution provides in relevant part: "A bill … or law impairing the obligation
of contracts may not be passed." Calif. Const. art. 1, § 9.

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    *Steel*, 438 U.S. at 245).

2          Here, the undisputed facts show that any impairment which resulted from Defendant's audit

3    policy was minimal. The bi-annual audit policy required pension recipients, once every two years,

4    to notarize the audit form, a service which even Plaintiff acknowledged costs only ten dollars. *See*

5    Katzman Dep. Tr. 36:18-:23; *see also* Cal. Gov't Code § 8211 (setting a maximum fee of ten

6    dollars for a notary public "taking an acknowledgment or proof of a deed, or other instrument, to

7    include the seal and the writing of the certificate"). Defendant also offered to verify the signatures

8    of pensioners for free if the pensioner visits Defendant's offices in Los Angeles. Katzman Decl Ex.

9    D. In addition, Defendant would accept a bank's certification of a pensioner's signature in lieu of

10   notarization, a service that Defendant contended most banks provide for free. Katzman Ex. E at 2;

11   Katzman Ex. I. Requiring pensioners to pay, at most, $10 every two years does not deprive a

12   pensioner of an important right, defeat a pensioner's reasonable expectation of receiving a pension,

13   or otherwise substantially impair the contractual relationship between Defendant and its

14   pensioners. *See S. California Gas Co*, 336 F.3d at 890; *see also Pac. Gas & Elec. Co. v. City of*

15   *Union City*, 220 F. Supp. 2d 1070, 1075, 1087-88 (N.D. Cal. 2002) (ordinance that imposed new

16   fees on contracted suppliers of utilities that resulted in an additional payment of at least $120,000

17   constituted a substantial impairment under the Contracts Clause).

18         Plaintiff appears not to dispute that the direct costs imposed by Defendant's audit procedure

19   are small. Rather, Plaintiff argued that pensioners also have to bear "the costs of traveling to a

20   notary" and the "loss of time expended obtaining notarization." Pl. Opp'n at 23. But this ignores

21   the fact that a pensioner can have his or her signature verified at no cost by a bank or the

22   Defendant, and therefore need not travel to a notary. Moreover, Plaintiff does not offer any

23   evidence as to what the costs of traveling to a notary are, and therefore fails to show that there is a

24   material issue as to the costs imposed by Defendant's audit policy. *See Anderson*, 477 U.S. at 250

25   (once party moving for summary judgment meets its initial burden, nonmoving party must set forth

26   "specific facts showing that there is a genuine issue for trial.")

27         Plaintiff, citing California law, also argued that if Defendant modified its pension system in

28

24

**United States District Court**
For the Northern District of California

a way that creates disadvantages to pensioners, those must be offset by affording pensioners comparable advantages. Pl. Opp'n at 23. Under California law, an employee's vested pension rights may be modified prior to the employee's retirement for the purpose of, among other things, "maintain[ing] the integrity of the system." *Betts v. Bd. of Admin.*, 582 P.2d 614, 617 (Cal. 1978). Such modifications must be reasonable. *Id.* "To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation," and any changes which "result in disadvantage to employees should be accompanied by comparable new advantages." *Id.* California courts have held that the "preservation or protection" of a pension system are reasonable justifications for modifications to that system. *Int'l Assn. of Firefighters v. City of San Diego*, 667 P.2d 675, 680 (Cal. 1983); *Claypool v. Wilson*, 6 Cal. Rptr. 2d 77, 88-89 (Ct. App. 1992). Here, again assuming that Defendant modified its audit procedure after Plaintiff's pension right vested, the reason Defendant offered for its audit policy—to prevent fraud and therefore protect the integrity of its pension system—is reasonable. *See Claypool*, 4 Cal. Rptr. at 88-89. Imposing such a policy offers pensioners the advantage of drawing from a pension fund that is less susceptible to fraud. Moreover, any disadvantages to pensioners are slight: they are merely required to have their signatures verified once every two years, a service that costs anywhere from nothing to ten dollars. Therefore, to the extent that Plaintiff challenged Defendant's policy for being unreasonable, or not offering pensioners any advantages comparable to attendant disadvantages, Plaintiff's argument fails.

Defendant's bi-annual audit procedure does not substantially impair Defendant's contractual relationship with its pensioners. Therefore, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim under the Contracts Clause of the U.S. and California Constitutions.

## IV.     CONCLUSION

For the foregoing reasons, the Court:

- DENIES Plaintiff's motion for summary judgment;

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DENIES Defendant's motion for summary judgment as to Plaintiff's Due Process claim;
- GRANTS Defendant's motion for summary judgment as to Plaintiff's Equal Protection claim;
- GRANTS Defendant's motion for summary judgment as to Plaintiff's claim for conspiracy to violate Plaintiff's Equal Protection rights;
- GRANTS Defendant's motion for summary judgment as to Plaintiff's Contracts Clause claim.

**IT IS SO ORDERED.**

Dated: November 4, 2014



LUCY H. KOH
United States District Judge

Case No.: 13-CV-00438-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING IN PART AND
GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT